# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI

————

No. 3:09-cv-00104

————

JOHN TYLER CLEMONS, JESSICA WAGNER, KRYSTAL BRUNNER, LISA SCHEA, FRANK MYLAR, JACOB CLEMONS, JENNA WATTS, ISSAC SCHEA, and KELCY BRUNNER,

Plaintiffs

v.

UNITED STATES DEPARTMENT OF COMMERCE, GARY LOCK, Secretary of the United States Department of Commerce, BUREAU OF THE CENSUS, and ROBERT GROVES, Director of the Bureau of the Census,

Defendants

————

Before SOUTHWICK, Circuit Judge, MILLS, Chief District Judge, and PEPPER, District Judge.

Leslie H. Southwick, Circuit Judge.

The number of seats in the United States House of Representatives is 435. That has been true for nearly one hundred years. Plaintiffs argue the Constitution requires an increase in the number in order to reduce the disparity in population among the districts in different States. Because the suit questions the constitutionality of the apportionment of Congressional seats, this three-judge district court panel was formed. 28 U.S.C. § 2284.

The parties have filed cross-motions for summary judgment. Arguments were heard on these motions. The government's motion for summary judgment is GRANTED, and the Plaintiffs' motion for summary judgment is DENIED.

## BACKGROUND

The Plaintiffs are voters from Mississippi, Delaware, Montana, South Dakota, and Utah. They identify significant disparities in the populations of the congressional districts in their States compared to the populations of districts in other States. The Plaintiffs insist there must be substantially more districts in order to reduce the population discrepancies.

The Defendants are official participants in the taking of the decennial national census. There is no argument that necessary parties are absent. We will refer to the Defendants simply as the government.

For the first six decades of our history, the number of seats in the House of Representatives increased after each decennial census and as new States joined the union. Following the 1850 Census, Congress began determining the number of seats in the House prior to apportioning the seats to the States. In 1911, Congress set the number of seats at 433 and provided that when New Mexico and Arizona became States, the number would become 435. Pub. L. No. 62-5, §§1 & 2, 37 Stat. 13-14 (1911). There it has remained other than for a brief increase to 437 when Alaska and Hawaii became States in 1959. *See* 2 U.S.C. § 2a(a) (refers to "the then existing number" of members, which was 435 when the statute was adopted). Not remaining static has been the population – 92 million in 1911 and over 300 million today.

The Constitution requires that each State be apportioned at least one Representative. U.S. CONST. art. I, § 2, cl. 3. After that fifty-seat allocation, 385 seats remain for apportioning based on population. This is done through a congressional Apportionment Plan which follows the national census conducted each decade since 1790. Due to the constitutional requirement that each State

have at least one Representative, the statutory requirement that there be 435 districts, and the fact that districts do not cross State lines, the population of the smallest congressional district is only 55 percent of that in the largest.

The current apportionment is based on the 2000 Census. According to the Plaintiffs, the ideal district population, meaning one that is exactly 1/435 of the national population, was 646,952 persons after the 2000 Census.[1] The Plaintiffs have identified the five States in which the average district size falls the farthest below the ideal district size and are considered overrepresented, and the opposite five States which are underrepresented:

> Most Overrepresented:
> - Wyoming – 1 district of 495,304 persons
> - Rhode Island – 2 districts averaging 524,831 persons
> - Nebraska – 3 districts averaging 571,790 persons
> - Iowa – 5 districts averaging 586,385 persons
> - West Virginia – 3 districts averaging 604,359 persons
>
> Most Underrepresented:
> - Montana – 1 district of 905,316 persons
> - Delaware – 1 district of 785,068 persons
> - South Dakota – 1 district of 756,874 persons
> - Utah – 3 districts averaging 745,571 persons
> - Mississippi – 4 districts averaging 713,232 persons

There is evidence that the disparities are exacerbated by the statutory cap of 435 on the number of House seats. The Plaintiffs claim that the disparities violate the requirement that Representatives be apportioned to the States "according to their respective numbers." U.S. CONST. art. I, § 2, cl. 3.

---

[1] The population used for apportionment may be different than the census population of a State. However, all population figures that we utilize from the record are of the apportionment population, and we will label them simply as "population" numbers. The government does not dispute any of the statistics in the Plaintiffs' briefs.

The Plaintiffs provide examples of how the disparities could be significantly reduced by increasing the size of the House either to 932 or to 1,761 seats. However, we are not asked to set by court order any particular number of seats. Rather, Plaintiffs seek invalidation of the relevant part of 2 U.S.C. § 2a, which would require Congress to consider anew the size of the House.

## DISCUSSION

### A.    *Political Question Doctrine*

The government initially raised four threshold points: (1) a statute of limitations; (2) the Plaintiffs' lack of standing; (3) the equitable doctrine of laches, and (4) the political question doctrine. By the time of oral argument, all had been abandoned except for the last, which we now discuss.

"Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Marbury v. Madison*, 5 U.S. 137, 170 (1803). Under our Constitution, certain questions cannot be answered by the judiciary. Among the reasons are the respect this branch needs to have for the coordinate branches and the lack of institutional competence to resolve certain matters. *See Baker v. Carr*, 369 U.S. 186, 198 (1962). A political question is one that is inappropriate for judicial resolution once we have explored the merits enough to know how intrusive or how incompetent a judicial decision would be. *See id.* We must make a "discriminating inquiry into the precise facts and posture of the particular case" when deciding whether to proceed. *Id.* at 217.

We start by examining how the Supreme Court has analyzed justiciability in other apportionment cases. The political question doctrine does not block review of challenges to intrastate congressional district apportionment plans.

4

*Wesberry v. Sanders*, 376 U.S. 1, 4-7 (1964). The Plaintiffs argue that the obligation of equality among intrastate districts is constitutionally translatable to a requirement that the current substantial disparity be reduced among House districts in different States.

The specific complaint here, that Congress's limit on the number of Representatives creates unconstitutional disparities, has not been the subject of much litigation.[2] In a related dispute, though, the Supreme Court held that it was a justiciable issue to review the mathematical formula Congress chose in assigning the 435 seats.

> The case before us today is "political" in the same sense that *Baker v. Carr* was a "political case." 369 U.S., at 217, 82 S.Ct., at 710. It raises an issue of great importance to the political branches. The issue has motivated partisan and sectional debate during important portions of our history. Nevertheless, the reasons that supported the justiciability of challenges to state legislative districts, as in *Baker v. Carr,* as well as state districting decisions relating to the election of Members of Congress, see, *e.g., Wesberry v. Sanders,* 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964); *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), apply with equal force to the issues presented by this litigation. The controversy between Montana and the Government turns on the proper interpretation of the relevant constitutional provisions. As our previous rejection of the political question doctrine in this context should make clear, the interpretation of the apportionment provisions of the Constitution is well within the competence of the Judiciary. *See Davis v. Bandemer,* 478 U.S. 109, 123, 106 S.Ct. 2797, 2805, 92 L.Ed.2d 85 (1986); *Baker v. Carr,* 369 U.S., at 234-

---

[2] The only other challenge to the limit of 435 seats was *Wendelken v. Bureau of the Census N.Y., N.Y.*, 582 F. Supp. 342 (S.D.N.Y. 1983). The court did not address justiciability. Rather, the court found no merit to the claims that the Constitution mandates one Representative per 30,000 persons in a State, or that limiting the number of Representatives violates the Fifth Amendment right to equal protection under the law. *Id.* at 342.

237, 82 S.Ct., at 719-721; cf. *Gilligan v. Morgan,* 413 U.S., at 11, 93 S.Ct., at 2446. The political question doctrine presents no bar to our reaching the merits of this dispute and deciding whether the District Court correctly construed the constitutional provisions at issue.

*Dep't of Commerce v. Montana*, 503 U.S. 442, 458-59 (1992) (footnote omitted).

One of the cases relied upon for these conclusions concerned political gerrymandering. *Davis,* 478 U.S. 109. Unlike the relatively simple mathematical issues that arise from one-person, one-vote analysis, *Davis* involved a more nuanced look at districts that were numerically sound but intentionally misshaped for political benefit. Still, none of the *Baker* formulations blocked review. The *Davis* Court concluded that justiciability need not turn on whether the dispute could be resolved by easy mathematical comparisons. *Id.* at 123. The *Baker* claims had earlier been found justiciable even though "[t]he one person, one vote principle had not yet been developed when *Baker* was decided." *Id. Baker* "contemplated simply that legislative line drawing in the districting context would be susceptible of adjudication under the applicable constitutional criteria." *Id.*

We next turn to the specific factors that *Baker* said we should consider. First, we are to determine if there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department . . . ." *Baker*, 369 U.S. at 217. Certainly, Congress has explicit authority to set the number of Representatives under Article I, section 2, and the Fourteenth Amendment, Section 2. These same provisions, though, did not bar judicial review in *Montana.* 503 U.S. at 457. The Court concluded that the Constitution puts some limits on Congress's power regarding apportionment, and violations of

6

those limits create legally enforceable rights; the issue was the definition of those limits. *Id*. This *Baker* formulation does not block review.

We also are to consider whether there are "judicially discoverable and manageable standards for resolving" the issues, and whether an initial policy determination would be required in evaluating the claims. *Baker*, 369 U.S. at 217. We conclude that whether having disproportionate districts among the different States violates a constitutional right is very much within the competence of courts because it involves determining what the Constitution means in this arena. At this point in the analysis, no policy decision arises.

The remaining formulations raise no more substantial problems for our review than they did in other apportionment cases. If we disagree with Congress's constitutional interpretation, that would be fulfilling our judicial role and would not be "expressing lack of the respect due coordinate branches of government." *Id*. There is no "unusual need for unquestioning adherence to a political decision already made," nor is there "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id*. There is entirely too much water under the electoral equality bridge for courts to reject having a role.

The issue is one for the courts.

B.    *Language and Original Meaning of Relevant Constitutional Provisions*

Before us are dueling motions for summary judgment. The only questions are legal ones, not factual. There being no disputed issues of material fact, summary judgment for someone is proper. FED. R. CIV. P. 56(c)(2). The central question is whether there is a constitutional dimension to the decision Congress has made concerning the number of districts. The dimension alleged by

7

Plaintiffs is that the congressional decision creates a barrier to reaching a goal of minimal population disparities in districts of different States.

The Constitution has two explicit controls and an implied one on the decision that Congress made in adopting Section 2a. Each State is to have at least one Representative, and the number of Representatives is not to exceed "one for every thirty Thousand." U.S. CONST., art. I., § 2, cl. 3. In addition, a "requirement that districts not cross state borders appears to be implicit in the text and has been recognized by continuous historical practice." *Montana*, 503 U.S. at 448 n.14 (citing *Montana v. Dep't of Commerce*, 775 F. Supp. 1358, 1365 n.4, 1368 (D. Mont. 1991) (O'Scannlain, J., dissenting)). There is no argument that Section 2a violates any of these requirements.

The Fourteenth Amendment updated certain language in Article I by requiring that "Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. CONST., amend. XIV, § 2. Grammatically, "their respective numbers" must be referring to the "whole number of persons in each State," the antecedent for "their" being "the several States." This at least means that apportionment of the House must reflect population differences to some degree. That seems to us the answer to the hypothetical question asked at oral argument as to whether having just fifty Representatives, *i.e.*, one per State, would be constitutional. Fifty members would satisfy the bare constitutional minimum of one Representative per State, no more than one per 30,000 population, and no crossing of State boundaries, but it would not have satisfied the obligation to apportion Representatives by

population. The House cannot be apportioned as is the Senate, which is without regard to the "respective numbers" of people.

Therefore, the Constitution, rather self-evidently, requires allocation of House districts by population. It is from this Constitutional imperative of apportionment by population that the Plaintiffs would have us impose on Congress a duty that approaches, even if it does not quite meet, the obligation of each State to assure that all of its own congressional districts have nearly equivalent population. The Constitution requires proportionate representation, but it does not express how proportionate the representation must be. Determining what else to read into the constitutional language requires us to turn to the usual sources for meaning.

The usual sources include the debates at the Constitutional Convention, the *Federalist Papers*, and the actions of the First Congress. *See United States v. Locke*, 529 U.S. 89, 99 (2000); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 716 (2004); *see also Gonzales v. Raich*, 545 U.S. 1, 58 (Thomas, J., dissenting). Some justices are more restrained in their reliance. Justice Scalia posits that the writers of the *Federalist Papers* and similar sources tell us no more than would the writings of other learned and well-informed writers of the day about how the text was understood. ANTONIN SCALIA, MATTER OF INTERPRETATION 38 (1997). They do tell us at least that.

Consequently, we examine what occurred at the Constitutional Convention that led to the clause we are interpreting, turn to the discussions about the provision during the ratification debate, then conclude with the actions of the First Congress and, necessarily, the Second Congress as well.

*1. Debate Over the Size of the House of Representatives During Constitutional Drafting and Ratification.*

The debate over representation in Congress was among the most contentious in the Constitutional Convention. "More than once any satisfactory solution of the difficulty seemed impossible, and the convention was on the point of breaking up." MAX FARRAND, FRAMING OF THE CONSTITUTION OF THE UNITED STATES 94 (1913) (hereinafter FARRAND). An early proposal, the Virginia Plan, called for a two-house legislature whose members would be chosen based on population. *Id.* at 68-69. On June 11, 1787, the Convention narrowly adopted proportional representation for both houses. *Id.* at 84. Delegates from small States were aghast. On June 15, the New Jersey Plan was offered as a reaction to the Virginia proposals. *Id.* This plan left the single-house Congress of the Confederation in place, in which each State had one vote. *Id.* at 84-85.

At least once, a delegate used words similar to "one person, one vote" terminology. Pennsylvanian James Wilson argued that "equal numbers of people ought to have an equal [number] of representatives . . . ." 1 RECORDS OF THE FEDERAL CONVENTION OF 1787 179 (June 9, 1787) (Max Farrand ed., 1911) (hereinafter CONVENTION RECORDS). Wilson argued that "[e]very citizen of one State possesses the same rights with the citizen of another." *Id.* at 183. The degree of precision with which Wilson was using the word "equal" is unclear. He was explaining his opposition to the position that each State ought to have the same representation. Wilson was not so clearly endorsing one Man, one vote, as he was rejecting one State, one vote.[3]

---

[3]    Counting of slaves also was contentious. The sad compromise finally made was to count a slave as three-fifths of a person for apportionment purposes. U.S. CONST. art. I, § 2.

Fortunately, on July 16, 1787, the Great Compromise was reached. It created a bicameral Congress with States having equal power in the Senate and power based on population in the House of Representatives. FARRAND 99-105. Each State's power in the Senate would be perfect in its equality. Quite imperfect, though, was a State's proportionate power in the House. Representatives – whole persons – would be sent from each State, with each member to have one vote. Only weighted votes could have made the proportions in the House as perfect as the equality in the Senate.

The devil remained in the details. The number of House members was a significant concern. For example, Elbridge Gerry,[4] a Massachusetts delegate, criticized having only sixty-five members in the First Congress. "The larger the number the less the danger from being corrupted. . . . The danger of excess in the number may be guarded [against] by fixing a point within which the number shall always be kept." 1 CONVENTION RECORDS 569.

James Madison had the opposite concern – the number would become too large. Should the number of members invariably grow proportionally with population or should Congress be able to make adjustments in the ratio of members to population? There was a thrust and parry dynamic to the debate:

> The original draft would have prescribed flatly one representative for each forty thousand persons. When Madison objected that as the population increased this ratio would produce an oversized and unwieldy House, it was amended to require no

---

[4] Gerry's name became half of a portmanteau for the act of deforming House districts for partisan reasons – a "gerrymander." The word was created when the shape of a district proposed by then-Governor Gerry in 1812 was said to resemble a salamander. KLYDE YOUNG & LAMAR MIDDLETON, HEIRS APPARENT 68 (1969). As noted above, the political question doctrine does not prevent consideration of the handiwork of Gerry's political descendants. *Davis,* 478 U.S. at 123.

> more than one for each forty thousand. When Williamson and others
> objected that at the outset one to forty thousand would produce too
> few members, it was revised to require no more than one to thirty
> thousand. When critics protested that Congress might be reluctant
> to increase the number of seats as permitted by this provision,
> Congress proposed a constitutional amendment that would have
> assured an increase in the size of the House by requiring one
> representative for each thirty thousand, until the total number
> reached one hundred members.

David P. Currie, *The Constitution in Congress: The Second Congress, 1791-1793*,

90 Nw. U. L. Rev. 606, 614 (1996) (hereinafter Currie) (footnotes and citations

omitted). The final language of the Constitution left Congressional discretion.

The only time the President of the Convention, George Washington,

entered into any debate was on this issue. On September 17, 1787, the day the

Constitution was to be signed, a delegate moved that the provision for no more

than one Representative to every forty thousand population be amended to no

more than one to every thirty thousand. Washington rose, said that he perhaps

should continue to forbear expressing his views, but he found the "smallness of

the proportion of Representatives had been considered by many members of the

Convention an insufficient security for the right and interest of the people."

Anti-Federalist Papers and the Constitutional Convention Debates 178

(Ralph Ketcham ed., 1986) (hereinafter Papers & Debates). Washington having

spoken, the amendment was unanimously adopted. The final document, already

prepared for the affixing of signatures that day, shows the alteration.

The debate continued once the completed Constitution was sent to State

conventions for possible ratification. Justifying providing flexibility to Congress,

Madison, writing as *Publius*, started with the premise "that no political problem

is less susceptible of a precise solution than that which relates to the number

most convenient for a representative legislature . . . ." *The Federalist* No. 55, at 287 (Gideon ed., 2001). Having too few Representatives would pose problems for consultation and discussion, leading to possible corruption or foreign influence. However, he also believed too many Representatives would lead to confusion and "intemperance of a multitude." *Id.* at 288.

As Madison colorfully noted: "In all very numerous assemblies, of whatever character composed, passion never fails to wrest the sceptre from reason. Had every Athenian citizen been a Socrates, every Athenian assembly would still have been a mob." *Id.* He argued that the initial House size and method for increasing that size in the proposed Constitution – sixty-five initial members followed by an increase of one for every thirty thousand inhabitants after the first census — would result in a sufficient number of Representatives to protect Americans from "treachery" and "tyranny." *Id.* at 288-89.

One of the active debaters on the subject at the Convention had been James Wilson of Pennsylvania. At his State's ratification convention, he urged the need for balance. "The convention endeavored to steer a middle course, and when we consider the scale on which they formed their calculation, there are strong reasons why the representation should not have been larger." 3 CONVENTION RECORDS 159.

We also examine writings of other learned contemporaries. A minimum House size was important to the Anti-Federalists, as they feared rule by the elites. Patrick Henry believed that Congress had the right to allocate only one representative per State and feared it would actually do so. Speech of Patrick Henry in Virginia Ratifying Convention (June 1788), in 5 THE COMPLETE ANTI-FEDERALIST 207, 213-14 (Herbert J. Storing ed., 1981).

Seeking to reduce the influence of elites, the Anti-Federalist Melancton Smith spoke at length at the New York ratification convention on the need for broader citizen membership: "the number of representatives should be so large, as that while it embraces men of the first class, it should admit those of the middling class of life." Speech of Melancton Smith in New York Ratifying Convention (June 20, 1788), in 6 COMPLETE ANTI-FEDERALIST 148, 157. "We may be sure that ten is too small and a thousand too large a number" for the House. *Id.* "A thousand would be too numerous to be capable of deliberating." *Id.* A small membership would create "a great danger from corruption and combination." *Id.* at 159. Smith argued that we "ought to fix in the Constitution those things which are essential to liberty. If anything falls under this description, it is the number of the legislature." *Id.* at 160. He believed Congress had too much discretion in setting the number of Representatives.

One Anti-Federalist sounded like Federalist James Wilson when writing that "representation in government should be in exact proportion to the numbers" of persons represented. Essays of Brutus, (Nov. 15, 1787), in 2 COMPLETE ANTI-FEDERALIST 377, 379. He was, though, countering the one State, two vote structure of the Senate. *Id.* He found the initial number of sixty-five House members to be "merely nominal – a mere burlesque" – and favored a very large House greater in size than the British Parliament of 558. *Id.* at 381.

The Anti-Federalist reservations were that they wanted individuals as well as States better protected within the Constitution from the tyranny of the few. The Anti-Federalists have been called "men of little faith." Cecilia Kenyon, *Men of Little Faith: The Anti-Federalists on the Nature of Representative Government*, XII WILLIAM & MARY Q. 3 (1955). They worried that liberties so

recently and narrowly won in war could be lost in peacetime to a powerful national government. 2 COMPLETE ANTI-FEDERALIST136-138. Having just a comparative handful of Representatives was a significant concern. Too few Representatives, not too many, seemed the far greater worry to them.

The Constitution was ratified, despite the doubts about its efficacy and postponed desires for amendments. On April 6, 1789, the House of Representatives achieved its first quorum. 1 Annals of Cong. 96 (1789) (Gales ed., 1834). Barely two months later, on June 8, 1789, James Madison, now as a Representative from Virginia, submitted a package of proposed amendments to assuage concerns about the Constitution. *Id.* at 434-36. The second was an amendment addressing some of the doubts raised again by these Plaintiffs 220 years later. *Id.* at 434.

The approval of an amendment by Congress followed by its failure in the States are not the usual materials of constitutional interpretation. We find, though, that the debate on the proposal sheds light on how the First Congress understood the operation of the original apportionment rules and whether it was concerned either about an overly large or small House or about the disparities of population between districts. The initial Madison proposal was this:

> That in article 1st, section 2, clause 3, these words be struck out to wit: "The number of Representatives shall not exceed one for every thirty thousand, but each State shall have at least one Representative until such enumeration shall be made;" and that in place thereof be inserted these words, to wit: "After the first actual enumeration, there shall be one Representative for every thirty thousand, until the number amounts to _____, after which the proportion shall be so regulated by Congress, that the number shall never be less than _____, nor more than _____, but each State shall, after the first enumeration, have at least two Representatives; and prior thereto."

*Id.* (blanks in original). This amendment would have set a minimum and maximum number of Representatives once a threshold number was met and would give each State at least two Representatives.

Madison explained that the State ratification conventions had expressed concern about the current language,

> and even in the opinion of the friends to the constitution, an alteration here is proper. It is the sense of the people of America, that the number of Representatives ought to be increased, but particularly that it should not be left in the discretion of the Government to diminish them, below that proportion which certainly is in the power of the Legislature as the constitution now stands; and they may, as the population of the country increases, increase the House of Representatives to a very unwieldy degree. I confess I always thought this part of the constitution defective, though not dangerous; and that it ought to be particularly attended to whenever Congress should go into the consideration of amendments.

*Id.* at 440. In summary, Madison accepted the need for an increase in the number of members, but wanted to avoid "an unwieldy" size. His statements that "alteration here is proper," and the language in the Constitution was "defective, though not dangerous," suggest that Madison found Congress to have an unnecessary right to set the number of members at an undesirably high or low figure, but there was no substantial or uncorrectable danger of its exercise.

A lengthy debate on the amendment occurred on August 14, 1789. Madison argued that going beyond a certain number "may become inconvenient; that is proposed to be guarded against [by the Amendment]; but it is necessary to go to a certain number in order to secure the great objects of representation." *Id.* at 722. Elbridge Gerry, now a Congressman, said he did not "insist upon a burthensome representation, but upon an adequate one." *Id.* Among the

debated concerns was whether a permanent cap of 175 members or instead of 200 members was appropriate. *Id.* at 725-28.

The House and the Senate each passed different versions of an apportionment amendment. *See* LEONARD W. LEVY, ORIGINS OF THE BILL OF RIGHTS 287, 291 (1999) (text of both versions). Both had thresholds of 100 and 200 Representatives. At the second threshold, the House required that there be not "less than one Representative for every fifty thousand persons." The Senate provided that once the second threshold was met, "one Representative shall be added for every subsequent increase of sixty thousand people."

Thus, both versions of the proposed apportionment amendment *required* the number of Representatives to increase in direct proportion with increases in the population. This would have undone Madison's work at the Constitutional Convention to eliminate similarly inexorable increases. Either proposal would have provided, without litigation, the relief Plaintiffs seek in this suit. At a population of 300 million, one proposal would have required at least 6,000 House members while the other would have demanded only 5,000. A significant change was made, though, just before submission to the States for ratification.

On September 24, 1789, it was resolved in the House "that the first article be amended, by striking out the word 'less' in the last place of said article, and inserting, in lieu thereof, 'more.'" 1 Annals of Cong. 913 (1789). The Senate concurred the next day. *Id.* at 87-88. The reason for the change was not explained, but it reflected Madisonian concerns.

The amendment as sent to the States was this:

*Article the first.* After the first enumeration required by the first article of the Constitution, there shall be one Representative for every thirty thousand, until the number shall amount to one

hundred, after which the proportion shall be so regulated by Congress, that there shall be not less than one hundred Representatives, nor less than one Representative for every forty thousand persons, until the number of Representatives shall amount to two hundred; after which the proportion shall be so regulated by Congress, that there shall not be less than two hundred Representatives, nor more than one Representative for every fifty thousand persons.

1 Stat. 97 (1789). Thus, the final version did not require the number of Representatives to increase inevitably and proportionally with the population once the second threshold was met. Instead, it would be for Congress to decide what number of districts above 200 was needed.

All but one of the States that ratified ten of the proposed amendments, *i.e.*, the Bill of Rights, also ratified Article the First. RICHARD B. BERNSTEIN, AMENDING AMERICA: IF WE LOVE THE CONSTITUTION SO MUCH, WHY DO WE KEEP TRYING TO CHANGE IT? 44-45 (1993). Delaware was the exception. *Id.* at 45. Delaware was the State most shortchanged by the one to 30,000 ratio, as it had a population of 55,539. 3 Annals of Cong. 248 (1791) (Gales ed., 1849). It had nothing to gain or lose from the amendment because that was the current ratio. With ratification by only ten of fourteen States, Article the First failed.[5]

We find in this history much useful information. Starting with the Constitutional Convention itself, there were twin concerns that the House would be either too small or too large. Just right was the goal. The ratification debate often focused on the need for a sufficiently numerous House. In Federalist No. 55, Madison was equally concerned about too large a body that would become

---

[5]    The third through twelfth proposals were ratified together as the Bill of Rights and became part of the Constitution in 1791. The second proposed amendment was eventually ratified by enough States and became the Twenty-Seventh Amendment in 1992.

unwieldy, though we might doubt his image that a mass of Socrates equivalents could ever be a mob. *The Federalist* at 288. We find no consideration that ever-increasing numbers of members were also needed to reduce disparity in the size of districts among the States. We also find many speakers admitting, and then bemoaning, that Congress had unfettered discretion in setting the size.

Finally, the development of what Congress sent to the States as the first of the proposed amendments indicated an initial willingness to require an ever-increasing size to the House, then a last-minute reversal that left it to Congress's discretion to set a maximum number. The failed amendment reflected a desire to assure a larger House than the initial Constitution's much more flexible provision. It did so by adopting two numerical requirements once the country's population increased to certain levels. Thereafter, Congress could set the number on a range between two hundred members and whatever number no more than one for every fifty thousand population would be. No debater indicated a belief that the Constitution as ratified *required* too large or too small a number, but only that it gave undue discretion.

We realize from the history of the Bill of Rights that the proposals were considered by some to be surplusage to rights and concepts inherent in the Constitution. GORDON S. WOOD, THE CREATION OF THE AMERICAN REPUBLIC, 1776-1787 540 (1969). They were offered at least in part to mollify those who had been reluctant to adopt the Constitution. David Yassky, *Eras of the First Amendment*, 91 COLUM. L. REV. 1699, 1705 (1991). Therefore, even though Congress in drafting its Article the First considered and then rejected requiring limitless growth and also rejected imposing a numerical limit on size, those decisions do not answer whether the Constitution as originally written required

or permitted either. At least it is obvious that the Constitutional Convention delegates, the debaters during ratification, and the drafters of the unratified Article the First were all aware of these issues and failed ultimately to give explicit directions. Flexibility was the result, subject to whatever implicit requirements of equality can be found.

On the other hand, we find no suggestion that there was a concern similar to that of the Plaintiffs, that increasing size was needed to reduce interstate disparities among district populations.

2.    *Initial Congressional Apportionment*

The actions of the First Congress are noteworthy in constitutional analysis because twenty of its members had been delegates to the Constitutional Convention from just two years earlier. *Bowsher v. Synar,* 478 U.S. 714, 723-24 (1986). We find that we need to consider the first Congress that adopted an apportionment plan, which was the Second Congress. The echoes from what was said by those at the Constitutional Convention were fading, but we cannot conclude that Congressmen in 1791-93 were completely deaf to those voices.[6]

The initial number of sixty-five Representatives set out in the Constitution would last until the first census could be taken and Congress could pass an apportionment bill. *See* U.S. CONST. art. I, § 2, cl. 3. Following the 1790 Census, the Second Congress decided how to apportion Representatives within the framework of the Constitution — at least one Representative per State and no

---

[6]    Eighteen of the fifty-five delegates to the Philadelphia Convention also served in the Second Congress, including James Madison. As mentioned in *Bowsher*, twenty served in the First Congress. So the Second was almost as representative of the Convention delegates.

more than one Representative per thirty-thousand people.[7] The concern of the Second Congress "was not first to determine the total number of seats or *house size* and then to distribute them, but rather to fix upon some 'ratio of representation,' . . . and then allow the house size to fall where it may." MICHAEL L. BALINSKI & PEYTON YOUNG, FAIR REPRESENTATION: MEETING THE IDEAL OF ONE MAN, ONE VOTE 11 (1982).

Debate in the House centered on whether the ratio of Representative to persons should be set at one to thirty thousand or at something higher. Currie*, 607-08. Opponents argued that using thirty thousand would result in "a House too large for deliberation and too costly to maintain." *Id.* at 607. Supporters argued that a smaller House "would make it impossible for members to know the views of their constituents and would reduce the influence of the people." *Id.* at 608. Whichever ratio of population to districts was used, no State would contain an exact multiple of the population figure. Minimizing unfairness was a goal. Hugh Williamson of Pennsylvania stated that a "ratio should be adopted as would leave the fewest fractions, and at the same time do as much justice as possible to those States." 3 Annals of Cong. 154 (1791). John Steele of North Carolina agreed, saying that a vital consideration in setting the number of congressmen was to decide "what ratio will leave the fewest fractions in the respective States?" *Id.* at 170. He calculated that having one member for every 30,000 population would leave 369,000 persons "unrepresented," while using

---

[7]    When debate over an apportionment bill began in November 1791, it was still unclear whether the proposed apportionment amendment would receive sufficient ratification to become part of the Constitution. Therefore, at least one Representative, Benjamin Bourne of Rhode Island, argued that Congress was wasting its time attempting to pass a law which would need to be repealed. 3 Annals of Cong. 200 (1791).

35,000 population "would leave the fewest fractions." *Id.* at 170-71. On November 15, a ratio of one member to every thirty thousand population was adopted. *Id.* at 192.

When the smallest State had a population of 55,539, common sense makes obvious that to divide each State's population by thirty thousand would give a whole number and then a fraction. Currie, 609-10 n.19 (chart). To reduce the number of States with large fractional remainders, the Senate amended the House bill by substituting the ratio of one to thirty-three thousand. *Id.* at 609-10. As a result, six of the larger States lost seats, but thirteen of the fifteen States had smaller fractional remainders. *Id.* at 610 (compare charts at n.19 and n.20).

Much of the ensuing House debate over the Senate's amendment focused on the inequalities that would arise due to fractional remainders regardless of the ratio chosen. 3 Annals of Cong. 243-50 (1791). William Giles of Virginia argued "that the apparent inequality in the representation of the smaller States, was rendered equal by their representation in the Senate." *Id.* at 247.

The concerns by some members and the acceptance by others of the inequality of representation was in full display during a December 13, 1791 debate. The motion being debated was to give a second member to Delaware.

> It was further observed, that the Constitution itself did not seem to exact so rigid an observance of the ratio as to require that any State should be deprived of Representation merely on account of a trifling deficiency in the number of inhabitants. It appeared visibly to contemplate such a deficiency . . . .

> In opposition to the proposed amendment, it was said that the Constitution never contemplated a minute attention to fractions; that the weight given to the smaller States in the Senate was a

concession, to compensate for any inequality that they might be subject to in the other branch of the Legislature; that the Constitution points out the apportionment according to their respective numbers of the several States. . . .

[Giving even the smallest States two Senators] operates to the disadvantage of the largest State, and in favor of the smaller ones, which have, therefore, no reason to complain of an inequality [resulting from fractional remainders] that exists but in idea; or if it does exist at all, bears heavier on the larger State, to which a smaller advantage in the House of Representatives can hardly be deemed a sufficient compensation for the loss it must necessarily suffer in the Senate.

*Id.* at 248-50. The motion was rejected. *Id.* at 250.

At least some of the 1791 debaters, then, would answer the Plaintiffs that the Senate is the Constitution's answer to the disparities among different State's House districts.

Fisher Ames of Massachusetts supported giving seven States an extra member. He presented a chart showing the result of first assigning members based on a ratio of one to thirty thousand, then giving one more member to each of the seven States with the largest fractions remaining. The average population of each district in those States was then slightly below 30,000 – the lowest being 27,769. It also showed the average population of the districts that did not get the extra member, and each of them was slightly more than 30,000 – the highest being 35,421. *Id.* at 259-60.

Madison argued that the plan was unconstitutional. He did not believe the fractional remainders were a significant concern and ridiculed the proposal of giving extra members to a few States: "Why not proceed to erect the whole of the United States into one district, without any division, in order to prevent the

inequality they conceive to exist in respect to individual States?" *Id.* at 265. As Madison may have been implying, a key reason for fractional remainders is that districts must be completely within a State's borders, almost inevitably leading to sizeable fractional remainders.

Elias Boudinot of New Jersey said "equal representation appears to have been the desirable object of the framers of the Constitution – it is the very spirit of our Government." *Id.* at 266. After noting that there can be no more than one member for every thirty thousand, he said that if that limit is "applied to the numbers in the individual States, it will always produce . . . very great inequality, by large fractions being unavoidable" such as Delaware's remainder of 25,539 persons. *Id.* His answer was to pick the ratio that created the greatest equality. One for every thirty-three thousand population would result in "reducing the fractions made by the bill nearly two-thirds." *Id.*

Another cogent observation was from John Laurance of New York. He rejected the relevance of the argument that choosing any particular ratio would not completely remove inequality. "He said, this was in effect saying, that because we could not do complete justice, we would not do it to any degree whatever." *Id.* at 273. He thought the Senate proposal provided for a "superior degree of equality" over the House plan, and he favored it. *Id.* However, by a 27 to 33 vote, the House refused to accept the Senate version. *Id.*

The Senate adopted a new proposal which the House accepted. It took the total population shown in the 1790 Census, divided that by 30,000, and concluded that the resulting 120 should be the total number of members. Then, dividing each individual State's population by 30,000, and using the whole number that resulted, a preliminary assignment of members was made to each

State. One more Representative was then assigned to the eight States with the highest remainders. *Montana*, 503 U.S. at 448-49; Currie, 611.

The bill was vetoed by President Washington for two reasons:

> First. The Constitution has prescribed that Representatives shall be apportioned among the several States according to their respective numbers; and there is no one proportion or divisor which, applied to the respective numbers of the States, will yield the number and allotment of Representatives proposed by the bill.

> Second. The Constitution has also provided that the number of Representatives shall not exceed one for every thirty thousand; which restriction is, by the context, and by fair and obvious construction, to be applied to the separate and respective numbers of the States; and the bill has allotted to eight of the States more than one for every thirty thousand.

3 Annals of Cong. 539 (1792). The veto was sustained. *Id.* at 541.

Washington's legal interpretation, which two in his Cabinet supported and two opposed, was that no single State could have more than one Representative per thirty thousand population; the counter-argument was that the ratio was simply for determining how many members there could be in the entire House based on the national population. Currie, 612 n.32. This difference of view is now academic due to the dramatically greater population in each district.

Thereafter, each house passed a bill allocating one seat for every thirty-three thousand population, ignoring fractional remainders entirely, and forming a House with 105 members. *Id.* at 615. An example of the effect of the change can be seen with Delaware. The vetoed plan assigned Delaware two House members for its population of 55,539. The final plan gave it only one.

The next four decennial plans also assigned just the whole numbers to each State and disregarded fractional remainders. *Montana*, 503 U.S. at 449-50.

It is of some moment, then, that even in the first implemented plan, approved in a chamber containing a third of the delegates to the Constitutional Convention, signed by the man who had presided over the Convention, large disparities between the comparative representation of States in the House were permitted. In the plan adopted, the deviation between the most and least populous districts was comparable to that challenged in this suit. Moreover, the original plan with less deviation was vetoed as being unconstitutional. The original plan had a population difference between the average district size in the most overrepresented and most underrepresented State of only 7,647 people. *See* Currie, 612 n.30 (chart). In contrast, the apportionment plan signed by President Washington permitted a difference of over 22,000 between Delaware's single district and the average size of New York's ten districts. *Id.*

It is also significant that the Second Congress accepted fractional remainders as an inevitable outcome of apportionment. Congressman Williamson stated the obvious: "No ratio could be adopted that would not leave fractions . . . ." 3 Annals of Cong. 333 (1792). Vermonter Nathaniel Niles agreed that "perfect equality is not attainable. . . ." *Id.* at 407. It is also true that many saw reducing the discrepancies as a goal. To restate Congressman Laurance's words, seeking a "superior degree of equality" was desirable. *Id.* at 273.

We have reviewed the Constitution's language, how early commentators interpreted it, and how the first Congress that dealt with apportionment exercised its discretion. Assuredly, the Plaintiffs' challenge today is one that could have been made even to the first apportionment plan adopted by the

Second Congress.  To use the Plaintiffs' own figures, the 1790 Apportionment Plan gave a vote in Delaware the worth of only 60% of a vote in New York.

Further, the statistics provided by the Plaintiffs reveal that equivalent disparities have been the norm each decade since 1790.  Under the 1800 apportionment, a vote in Delaware was worth only 54% of a vote in Tennessee. The 1810 apportionment was an improvement, as a vote in Tennessee was worth 86% of a vote in Massachusetts.  The 1820 apportionment was a regression, as a vote in Delaware was worth only 52% of a vote in Alabama.  Thus, disparities in the worth of votes among the States, *i.e.*, under- and overrepresentation, is not a new phenomenon.  The submissions to the court also indicate that despite different apportionment methods that have been adopted by Congress – basically different methods to address the fractional remainders – disparities between interstate districts have always been significant.

We see no reason to believe that the Constitution as originally understood or long applied imposes the requirements of close equality among districts in different States that the Plaintiffs seek here.

Nonetheless, these early views of acceptance of such deviations are not a complete answer.  The Supreme Court's interpretations of the Constitution's mandates in the area of population variations among political districts have reflected evolving standards of equality.  In 1962-64, the Court made dramatic, perhaps revolutionary, decisions about the demands of equality for intrastate representative districts.  It rejected the political question doctrine as a bar to claims that a State legislature's apportionment scheme denied Equal Protection in *Baker v. Carr*, 369 U.S. 186; it required for the first time that "a State make an honest and good faith effort to construct districts, in both houses of its

legislature, as nearly of equal population as is practicable" in *Reynolds v Sims*, 377 U.S. 533, 577 (1964); it also held for first time that Congressional districts within a State must be substantially equal in population in *Wesberry v. Sanders*, 376 U.S. 1 (1964). That too requires "a good-faith effort to achieve precise mathematical equality." *Kilpatrick v. Preisler*, 394 U.S. 526, 530-31 (1969).

What we still must consider, then, is whether Supreme Court precedents have given us direction to require more in apportionment than what we have found to be the limits of necessity under the early understandings.

C.    *Judicial Consideration of Constitutionality of Interstate Disparities*

Before turning to the law, we summarize the facts of the inequality as the Plaintiffs present it. They calculate the comparative worth of their vote by dividing the number of persons in the most overrepresented State – Wyoming with one district – by the average number of persons per district in each of the Plaintiffs' States. Based on these calculations, voters in the Plaintiffs' underrepresented States have the following worth per vote as compared to voters in Wyoming, the most overrepresented State: Montana (55%), Delaware (63%), South Dakota (65%), Utah (66%), and Mississippi (69%).

The claim is that these large disparities in the comparative worth of votes between States violates the principle of "one person, one vote" announced by the Supreme Court in its intrastate redistricting cases. The Plaintiffs argue that the Supreme Court has held that even small disparities between intrastate congressional districts are unconstitutional, so much larger disparities among *interstate* congressional districts are likewise unconstitutional.

We examine the case most insistently urged upon us. In the early 1960s, voters challenged a 1931 Georgia statute that set the boundaries for ten

congressional districts. *Wesberry,* 376 U.S. at 2. The boundaries had not been changed despite changes in population. *Id.* According to the 1960 Census, the Fifth District surrounding Atlanta had a population of 823,680 persons; the average population of the other nine districts was less than half that. *Id.* The Supreme Court held that the significant population disparities devalued the comparative worth of a vote in the Fifth District and made the 1931 statute unconstitutional.

> We hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen "by the People of the several States" means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's. . . . To say that a vote is worth more in one district than in another would not only run counter to our fundamental ideas of democratic government, it would cast aside the principle of a House of Representatives elected "by the People," a principle tenaciously fought for and established at the Constitutional Convention. The history of the Constitution, particularly that part of it relating to the adoption of Art. I, § 2, reveals that those who framed the Constitution meant that, no matter what the mechanics of an election, whether statewide or by districts, it was population which was to be the basis of the House of Representatives.

*Id.* at 7-9 (footnotes and citations omitted).

The Supreme Court examined the historical record. As late as in 1842, seven States were electing their Representatives at large. *Id.* at 8 n.11. Other, less dramatic disparities in voting power also were clearly accepted. Justice Black reviewed the debate in the Constitutional Convention that led to the Great Compromise, *i.e.*, each State having equal power in the Senate but having power based on population in the House. The Court quoted James Wilson, one of the few to use terms such as "equal numbers of people ought to have an equal

[number] of representatives," and representatives "of different districts ought clearly to hold the same proportion to each other, as their respective constituents hold to each other." *Id.* at 10-11 (quoting CONVENTION RECORDS at 180).

The Court summarized this way: "for us to hold that, within the States, legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others" would "defeat the principle solemnly embodied in the Great Compromise – equal representation in the House for equal numbers of people." *Id.* at 14. This language, explicitly referring to what States must do within their own boundaries, certainly *could* be extended to support the Plaintiffs' position.

The Supreme Court in *Wesberry* relied on the clause that Representatives were to be chosen "by the People of the several States" and apportioned "according to their respective numbers" for the requirement of rough equality in population of districts within a State. *Id.* at 17 (quoting U.S. CONST. art. I, § 2, altered by amend. XIV, § 2). Plaintiffs here rely on the same.

The *Wesberry* Court accepted that it might not be possible to draw perfectly equal congressional districts. However, not being able to achieve perfect equality "is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives." *Id.* at 18. We do not survey later decisions implementing the *Wesberry* command. The Plaintiffs now ask this court to extrapolate the reasoning and apply it to this case, which involves population disparities among interstate districts.

In deciding whether, and if so, how far to extend the intrastate district requirements of equality into interstate apportionment, we find particular

guidance from the Supreme Court's decision in a suit that contested the 1991 Apportionment Plan. *Montana*, 503 U.S. 442. Under the previous Apportionment Plan adopted in 1981, Montana was the most overrepresented State. It had two House districts with an average population of 393,345. Though Montana had a slight population increase during the 1980s, the faster growth in some other States caused Montana to lose its second district after the 1990 Census. Montana now had only one Representative for its population of 803,655, moving it from being the most overrepresented to being the most underrepresented State.

Montana brought suit challenging the constitutionality of the same statute with which we contend, 2 U.S.C. § 2a, and making the same argument of a violation of Article I, section 2 of the Constitution. The complaint was about an apportionment calculation called the "method of equal proportions," a phrase used in Section 2a(a) to refer to the method that Congress adopted to apportion seats among the States. *Montana*, 503 U.S. at 452-53. The Supreme Court detailed at some length the five mathematical methods that were considered and how they operated, mechanics of no import in the present case. *Id*. at 452 n.26. Montana argued that a different methodology would provide greater equality in the number of individuals per representative. *Id*. at 446. Not incidentally, the preferred method would also give Montana another member of Congress. *Id*. at 460-61. The Court noted that Massachusetts had brought suit in a different district court, claiming yet another method was fairer. *Id*. at 447 n.13. That preference undoubtedly benefitted Massachusetts.

The Supreme Court reviewed the decision by a three-judge district court panel which had accepted the State's argument. *Montana*, 775 F. Supp. 1358.

The panel majority had held the principles of equality set out in *Wesberry* also applied to apportionment of Representatives among States. Section 2a was unconstitutional, the panel concluded, because the population disparity between Montana's single district and the ideal district was not unavoidable despite a good-faith effort to achieve population equality. *Id.* at 1366. In dissent, Circuit Judge O'Scannlain highlighted how many different methods Congress had used before settling on the method of equal proportions in 1941. He argued that equality among the 435 interstate districts was impossible. *Id.* at 1368-69 (O'Scannlain, J., dissenting).

A unanimous Supreme Court reversed. *Montana*, 503 U.S. at 465-66. Because each State must have one representative, in "Alaska, Vermont, and Wyoming, where the statewide districts are less populous than the ideal district, every vote is more valuable than the national average." *Id.* at 463. Not questioning the constraint that creates the Plaintiffs' concern in our case, the Court found a "need to allocate a *fixed number* of indivisible Representatives among 50 States of varying populations," making equality "virtually impossible" in the different States. *Id.* (emphasis added). The Court reaffirmed the need for a "'good-faith effort to achieve precise mathematical equality' *within* each State," but it found "the constraints imposed by Article I, § 2, itself make that goal illusory for the Nation as a whole." *Id.* (citations omitted). As we will explain, the Court found no need to decide if the *Wesberry* principles applied.

The change Montana sought would have affected only Washington State by giving one of its seats to Montana. *Id.* at 460-61. One mathematical method might seem better from one perspective, but not from another:

What is the better measure of inequality – absolute difference in district size, absolute difference in share of a Representative, or relative difference in district size or share? Neither mathematical analysis nor constitutional interpretation provides a conclusive answer. In none of these alternative measures of inequality do we find a substantive principle of commanding constitutional significance. The polestar of equal representation does not provide sufficient guidance to allow us to discern a single constitutionally permissible course.

*Montana*, 503 U.S. at 463.

The Plaintiffs find *Montana* to be little guidance, because the validity of having a fixed number of Representatives was not addressed in *Montana*. That is certainly true. Also certain is that limits to the factual focus in *Montana* do not limit its analytical reach. The *Montana* Court analyzed the method of equal proportions as if the Court were open to setting it aside if it failed to meet some fundamental level of reasonableness or good faith. The Court found "some force to the argument that the same historical insights that informed our construction of Article I, § 2, in the context of intrastate districting should apply here as well." *Id.* at 461. The mandate for intrastate equality found by *Wesberry* came from the phrase that members of the House would be chosen "by the People of the several States"; "we might well find that the requirement that Representatives be apportioned among the several States 'according to their respective Numbers' would also embody the same principle of equality." *Id.*

If *Wesberry* applied, the Court said that Congress's decisions would be reviewed with deference. "The constitutional framework that generated the need for compromise in the apportionment process must also delegate to Congress a measure of discretion that is broader than that accorded to the States

in the much easier task of determining district sizes within state borders." *Id.* at 464. Congress had apparently made a "good-faith choice of a method of apportionment of Representatives among the several States," and the choice "commands far more deference than a state districting decision that is capable of being reviewed under a relatively rigid mathematical standard." *Id.* The Court was satisfied that Congress's choice would be valid under *Wesberry*. No holding as to *Wesberry*'s applicability was needed. *Id.* at 461-66.

From all this, Plaintiffs argue that Congress must make a good-faith effort towards the goal of equivalence. There is "some force" to this argument. It is less forceful as to our issue, though, than it was in the *Montana* case.

In *Montana*, if the method of equal proportions had caused much greater disparities than some other method, then a challenge would have had facts to support judicial adjustments at the margins of apportionment. Quite differently, Plaintiffs here seek judicial entry into the exact area of decision-making that was reserved for Congress. The Constitution allows Congress to set the number of House members. Mathematics do not control. The Convention and the early Congresses rejected all proposals that would have made increases inexorable with increases in population. Though some Convention delegates and early Congressmen sought ever-increasing numbers of members, the more foresighted ones (so it seems in hindsight) always reined in those impulses.

All that said, Plaintiffs still assert that practical solutions exist to these seemingly intractable disparities. Adding ten more districts will have some impact, they say, which suggests that continually reduced disparities follow from ever-increasing numbers of districts. We do not see that as evidence Congress ignores, perhaps in bad faith, various reasonable solutions. Plaintiffs accept

that anything short of an astronomical increase in the number of House members would still leave the population disparities among interstate districts strikingly greater than those held unconstitutional for intrastate districts. Congress's failure, then, to make the inequality slightly less is within its discretion to balance many factors, including Madisonian unwieldiness, that cannot then be reviewed by elementary arithmetic.

We return the issue of *Wesberry*'s applicability to the place the Supreme Court in its *Montana* opinion left it. If those principles apply, it is not evident that Congress has failed properly to exercise its broad discretion.

In effect, Plaintiffs seek to perfect the balance struck by the Great Compromise. The Framers mandated perfect equality in the Senate and allowed practical proportions in the House. From the beginning, those practicalities allowed disparities as severe as those that form the factual basis of this lawsuit. The spirit of this Great Compromise, the Supreme Court observed, "must also have motivated the original allocation of Representatives specified in Article I, § 2, itself." *Id*. at 464. That original allocation, written into the Constitution as a temporary measure despite significant variations among the States, was as "constitutional" as anything could be. Continuing even today, "compromise between the interests of larger and smaller States must be made to achieve a fair apportionment for the entire country." *Id*.

Appropriate as we conclude is to restate the Supreme Court's concluding analysis in *Montana*. It focuses us on the very practical compromise embedded in Section 2a, as was also embedded in the Constitution itself:

> The decision to adopt the method of equal proportions was made by Congress after decades of experience, experimentation, and debate about the substance of the constitutional requirement.

Independent scholars supported both the basic decision to adopt a regular procedure to be followed after each census, and the particular decision to use the method of equal proportions. For a half century the results of that method have been accepted by the States and the Nation. That history supports our conclusion that Congress had ample power to enact the statutory procedure in 1941 and to apply the method of equal proportions after the 1990 census.

*Id.* at 465-66 (footnote omitted). Congress has continued to resolve through Section 2a a practical political question, even if not legally such a question, on how to balance all the considerations affecting the size of the House. We do not put a finger on the scale to alter the balance reached.

Congress's decision to limit the number of Representatives to 435 is valid.

The government's motion to dismiss is DENIED, and its motion for summary judgment is GRANTED. The Plaintiffs' motion for summary judgment is DENIED.